**Opinion issued August 24, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00641-CR

————————————

**ANTHONY TERRELL CLIFTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case No. 1633925**

---

## MEMORANDUM OPINION

A jury convicted Appellant Anthony Terrell Clifton of the offense of aggravated assault of a family member and the trial court assessed his punishment at fourteen-years' incarceration. Appellant raises nine issues on appeal. He argues (1) the trial court lacked jurisdiction because the grand jury did not present the

indictment to the district court that empaneled the grand jury, (2) Sections 54A.006(d) and 54A.008(a)(15) of the Texas Government Code allowing associate judges to preside over voir dire proceedings, violate Article V, Section 7 of the Texas Constitution, (3–4) the trial court abused its discretion by barring him from asserting his rights under the Sixth Amendment's Confrontation Clause based on the doctrine of forfeiture by wrongdoing and by admitting out-of-court statements from a witness who was not available to be cross-examined, (5) the trial court's oral admonishments regarding his inability to possess firearms based on a felony conviction did not comply with the requirements of Section 176.1 of the Texas Administrative Code, (6) the trial court improperly admonished him that, as a convicted felon, he could no longer possess ammunition, (7) the trial court erred in assessing court costs not authorized by statute, (8) the trial court erred by failing to inquire on the record about his ability to pay fines and court costs, and (9) the judgment contains five "deficiencies" that require the case be remanded to the trial court for "clarification."

We affirm Appellant's conviction and sentence, but we remand the case to the trial court for a correct assessment of court costs.

## Background

On June 3, 2019, Jerika Sanders ("Sanders") called 9-1-1 for emergency assistance after she was involved in an altercation with her boyfriend, Appellant Anthony Terrell Clifton ("Clifton"). Sanders told the dispatcher, "My boyfriend

2

tortured me and locked me in the house and beat me up. I am bleeding. I need an ambulance." "He used a pole to beat me and a glass to stab me." Sanders identified Clifton as her assailant. The paramedics who arrived at the scene treated Sanders and transported her to the hospital.

Sanders described the assault to the paramedics, and she made recorded statements to Deputy Norman Fitts, an investigator with the Harris County Sheriff's Office, and prosecutors with the Harris County District Attorney's Office assigned to Clifton's case. According to Sanders, Clifton assaulted her in their apartment for two-and-a-half to three hours before she was able to call 9-1-1. Clifton slapped Sanders, punched her in the face, and beat her with a belt. At one point during the lengthy ordeal, Clifton grabbed a wine glass out of Sanders' hand, and he struck her face and head with the glass until it broke. Clifton then stabbed Sanders' face and hand with the broken wine glass. He also beat Sanders with a bathroom towel rack and a pole he found in the apartment.

Photographs taken of Sanders after the assault show the extent of Sanders' injuries. Sanders had dried blood on her face, forehead, and arms, puncture wounds on her head, hands, arms, and legs, and welts on her shoulders and legs. Her left eye

was swollen shut and her lips were swollen. The cuts under Sanders' left eye, upper lip, and forehead required sutures.[1]

## Procedural Background

The State filed a complaint alleging Clifton had committed the offense of aggravated assault of a family member by "unlawfully, intentionally and knowingly caus[ing] bodily injury to Jerika Sanders, hereafter styled the Complainant, a person with whom [Clifton] had a dating relationship, by stabbing [Sanders], and [Clifton] used and exhibited a deadly weapon, namely, the sharp end of broken wine glass stem, during the commission of the offense." The State filed the complaint in the 178th District Court of Harris County (the "178th Trial Court"). A grand jury, empaneled by the 176th District Court of Harris County, returned a true bill of indictment concerning the conduct alleged in the complaint (the "176th District Court"). The indictment, which charged Clifton with committing the offense of aggravated assault of a family member, was delivered to the Harris County District Clerk and filed in the 178th Trial Court. The indictment was issued by "[t]he duly organized Grand Jury of Harris County, Texas" and signed by the "Foreman of the Grand Jury" for the 176th District Court. Clifton did not object to the indictment.

---

[1] State Exhibits 14, 15, 16, 23, 24, 25, 48, 49, and 50 are photographs depicting Sanders' injuries.

Except for the grand jury proceedings in the 176th District Court, all proceedings in Clifton's case were conducted in the 178th Trial Court. The associate judge of the 178th Trial Court presided over voir dire proceedings and the district court judge of the 178th Trial Court presided over the remainder of Clifton's trial.

On August 25, 2022, the day Clifton's trial was scheduled to begin, the State filed a motion requesting that the court find Clifton had "forfeited his Sixth Amendment right to confrontation with regard to the statements of Jerika Sanders," based on the doctrine of forfeiture by wrongdoing.[2] The State alleged that Clifton "dissuaded [Sanders] from participating in the criminal prosecution of this case." The State argued, among other things:

> [Clifton] repeatedly directed family members to contact [Sanders] from jail after he was arrested in 2019 and has continued to direct family members to contact [Sanders] to ensure she does not show up for trial as recently as the evening of 8/24/2022.

> Throughout three years since [Clifton] stabbed [Sanders], despite a no contact order, he has continued to contact [Sanders] for the purpose of ensuring she does not show up to trial.

> While on bond, [Clifton] contacted [Sanders] and attempted to persuade her to get back into a relationship with him.

> . . .

---

[2] The doctrine of forfeiture by wrongdoing bars defendants from asserting their Sixth Amendment rights to confront their accusers or complain about hearsay when a defendant wrongfully procures a witness's unavailability. *See Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019); *see also* TEX. CODE CRIM. PROC. art. 38.49 (codifying doctrine of forfeiture by wrongdoing).

[Clifton] told his mother [Viola Clifton] to contact [Sanders] and make sure she is not coming to court, because if she does not come, he believes the case will be dismissed.

On August 18, 2022 [Sanders] was subpoenaed to come to court, acknowledged the subpoena, and was cooperative.

On August 19, 2022 [Sanders] was cooperative and discussing travel arrangements with the victim advocate coordinator.

On August 20, 2022 Prosecutors met with [Sanders] over a zoom call, [Sanders] was cooperative, discussed courtroom attire, reviewed photos, and shared what happened to her on June 3, 2019.

On August 21, 2022 after repeatedly telling his mother to call [Sanders] to make sure she was not coming to court, [Clifton's] mother reported that she told [Sanders] she did not have to come, and bribed [Sanders] with 2,000 dollars of baby clothes.

As of August 22, 2022 [Sanders] did not respond to the State again.

August 24, 2022 [Clifton's] mother affirms that [Sanders] received the 2,000 dollars of baby clothes, and that [Sanders] is not coming to trial.

[Sanders] said she fears [Clifton's] family. [Sanders] knows of the court setting, but she refuses to testify.

The State requested a hearing on its motion and asked the court to "admit through the doctrine of forfeiture by wrongdoing" (1) Sanders' "statement to detectives at the hospital," (2) Sanders' "statement in a witness meeting on 8/20/22," and (3) "Jail calls made" by Clifton.

The trial court conducted an Article 38.49 hearing outside the jury's presence to determine whether the forfeiture by wrongdoing doctrine applied to Sanders' out-

of-court statements rendering them admissible.[3]  At the hearing, the State offered as evidence recordings of several phone calls Clifton made from jail, as well as a transcript of relevant sections of the calls.  The State also called four witnesses: Sergeant Mark Schmidt, Investigator Bilsen Espinosa, Deputy Norman Fitts, and Caseworker Maria Bahena.[4]

Based on Clifton's phone calls and evidence that Sanders had been cooperative with the State until Clifton's mother bribed her with $2,000 worth of baby clothes to not testify at Clifton's trial, the trial court found by a preponderance of the evidence that Clifton acted with the intent to procure Sanders' absence at trial, and he thus forfeited his Sixth Amendment right to confront Sanders or object to the admission of Sanders' out-of-court statements as hearsay.

Clifton's trial began the next day.  Clifton pleaded not guilty.  When Sanders failed to appear for trial, the State admitted several of her out-of-court statements, including a report prepared by the Community Volunteer Fire Department containing statements Sanders gave to a paramedic describing the assault (State

---

[3]     Article 38.49(c) requires the trial court to conduct a hearing outside of the jury's presence to determine "whether forfeiture by wrongdoing occurred by a preponderance of the evidence." TEX. CODE CRIM. PROC. art. 38.49(c).

[4]     We address the evidence and testimony presented at the hearing in more detail later in this opinion.

Exhibit 55), and Sanders' hospital records containing statements she made describing the assault and identifying Clifton as her assailant (State Exhibit 56).[5]

The jury convicted Clifton of the offense of aggravated assault of a family member. The trial court assessed his punishment at fourteen-years' incarceration. This appeal followed.

## Trial Court's Jurisdiction

In his first issue, Clifton argues that the judgment of conviction is void because the 178th Trial Court never acquired jurisdiction over his case. According to Clifton, Article 21.02(2) of the Texas Code of Criminal Procedure requires a grand jury to present its indictment to the same district court that empaneled the grand jury. *See* TEX. CODE CRIM. PROC. art. 21.02(2). Clifton argues that the grand jury failed to comply with Article 21.02(2) because, instead of presenting the indictment against Clifton to the 176th District Court—the court that empaneled the grand jury—the grand jury presented the indictment to the 178th Trial Court. According to Clifton, the grand jury's failure to comply with Article 21.02(2) renders the indictment against him a nullity. Thus, he argues it could not have conferred jurisdiction upon any court.

---

[5] The trial court also admitted four of Clifton's jail calls as State Exhibit 57. State Exhibit 57 includes the January 24, 2022 call (State Exhibit 4), the January 26, 2022 call (State Exhibit 4), the August 19, 2022 call (State Exhibit 5), and the August 21, 2022 call (State Exhibit 6).

8

The State argues that Clifton's argument has been rejected multiple times by this Court and the Fourteenth Court of Appeals. *See Allen v. State*, 570 S.W.3d 795, 799–802 (Tex. App.—Houston [1st Dist.] 2018), *aff'd*, 614 S.W.3d 736 (Tex. Crim. App. 2019); *Johnson v. State*, 562 S.W.3d 168, 172–74 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). Relying on *Allen v. State* from this Court and *Johnson v. State* from our sister court, the State argues the grand jury satisfied the presentment requirement in Article 21.02(2) because it presented the indictment to the Harris County District Clerk, the court clerk for *all* Harris County district courts.

In his reply brief, Clifton argues that (1) presentment of an indictment to a district clerk does not satisfy the requirement in Article 21.02(2) that the indictment be presented to the district court that empaneled the grand jury, (2) there is no evidence the indictment was presented to the empaneling court as required by Article 21.02(2), (3) the presentment of an indictment to one district court does not vest jurisdiction in all district courts in the same county, and (4) *Allen* and *Johnson* are inapposite because they do not address the requirement in Article 21.02(2) that an indictment must be "presented in the district court of the county where the grand jury is in session" and both opinions are inconsistent with the requirements in Article 21.02(2).

**A.    Standard of Review**

A defendant may challenge the trial court's jurisdiction for the first time on appeal. *See State v. Dunbar*, 297 S.W.3d 777, 780 (Tex. Crim. App. 2009). "A trial court's jurisdiction over a criminal case consists of the power of the court over the 'subject matter' of the case, coupled with 'personal' jurisdiction over the accused." *Jenkins v. State*, 592 S.W.3d 894, 898 (Tex. Crim. App. 2018) (quoting *Dunbar*, 297 S.W.3d at 780). "The presentment of a valid indictment vests the district court with jurisdiction of the cause." *Id.* (citing TEX. CONST. art. V, § 12(b)). Whether an indictment is sufficient to confer jurisdiction presents a question of law, which we determine de novo. *Leone v. State*, 508 S.W.3d 346, 347 (Tex. App.—Fort Worth 2014, pet. ref'd).

A void judgment in a criminal case is a "nullity" and that may be attacked at any time. *Nix v. State*, 65 S.W.3d 664, 667–68 (Tex. Crim. App. 2001). Void judgments, which are "very rare," occur when, among other things, the indictment "does not satisfy the constitutional requisites of a charging instrument," and thus deprives the trial court of jurisdiction over the defendant. *Id.* at 668. Whether a judgment is void is a question of law, which we determine de novo. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

**B.     Applicable Law**

Article 5, Section 12(b) of the Texas Constitution states:

An indictment is a written instrument presented to a court by a grand jury charging a person with the commission of an offense.   An information is a written instrument presented to a court by an attorney for the State charging a person with the commission of an offense.  The practice and procedures relating to the use of indictments and informations, including their contents, amendment, sufficiency, and requisites, are as provided by law.  The presentment of an indictment or information to a court invests the court with jurisdiction of the cause.

TEX. CONST. art. V, § 12(b).  A defective indictment may still vest a court with jurisdiction so long as the indictment meets the constitutional definition of an indictment. *Jenkins*, 592 S.W.3d at 898.  A written document meets the definition of indictment under the Texas Constitution if it charges a person with the commission of an offense. *Id.* ("To meet the definition of indictment under article V, section 12(b) of the Texas Constitution and to vest the court with both personal and subject matter jurisdiction, the indictment must (1) charge a person, and it must (2) charge the commission of an offense."); *see also* TEX. CONST. art. V, § 12(b) ("An indictment is a written instrument presented to a court by a grand jury charging a person with the commission of an offense.").

Article 21.02 of the Texas Code of Criminal Procedure sets forth the legal requirements for an indictment.  TEX. CODE CRIM. PROC. art. 21.02.  It states that "[a]n indictment shall be deemed sufficient" if it meets nine listed requisites. *Id.* Under requisite number 2, "[i]t must appear that the [indictment] was presented in

11

the district court of the county where the grand jury is in session." *Id.* 21.02(2). A grand jury presents an indictment to a court by "deliver[ing] the indictment to the judge or court clerk." TEX. CODE CRIM. PROC. art. 20A.303.

## C. Presentment of Indictments in Harris County

The Texas Code of Criminal Procedure governs grand jury proceedings in Texas. *See Allen*, 570 S.W.3d at 799; *see also* TEX. CODE CRIM. PROC. arts. 20A.001–.304. A district court forms and impanels a grand jury and empowers it to inquire into indictable offenses. *See Allen*, 570 S.W.3d at 799; TEX. CODE CRIM. PROC. art. 20A.051 ("The grand jury shall inquire into all offenses subject to indictment of which any grand juror may have knowledge or of which the grand jury is informed by the attorney representing the state or by any other credible person.").

After hearing testimony, the grand jury votes on the presentment of an indictment and if "at least nine grand jurors concur in finding the bill," the State will prepare the indictment and deliver it to the grand jury foreman. *See* TEX. CODE CRIM. PROC. arts. 20A.301–.302; *Allen*, 570 S.W.3d at 799. "When an indictment is ready to be presented, the grand jury shall, through the foreperson, deliver the indictment to the judge or court clerk." TEX. CODE CRIM. PROC. art. 20A.303. An indictment is considered presented "when it has been duly acted upon by the grand jury and received by the court." *Id.* art. 12.06. Presentment occurs "when an indictment is delivered to either the judge or the clerk of the court." *Allen*, 570

12

S.W.3d at 799. "The presentment of a valid indictment vests the district court with jurisdiction of the cause." *Jenkins*, 592 S.W.3d at 898 (citing TEX. CONST. art. V, § 12(b)).

Criminal district courts within the same county have original jurisdiction over all felony criminal cases in that county. *See Allen*, 570 S.W.3d at 800; *see also* TEX. CODE CRIM. PROC. art. 4.05; TEX. GOV'T CODE § 74.094. In Harris County, Texas, the criminal district courts share the same clerk. *Allen*, 570 S.W.3d at 800; *Henderson v. State*, 526 S.W.3d 818, 820 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).

Article V, Section 11 of the Texas Constitution states in part that "District Judges may exchange districts, or hold courts for each other when they may deem it expedient, and shall do so when required by law." TEX. CONST. art. V, § 11; *see generally In re State ex rel. Wice*, 668 S.W.3d 662, 675 (Tex. Crim. App. 2023) (reaffirming that this broad grant of authority bestows flexibility upon district court judges). It is well-settled that Article V, Section 11, and the sections of the Texas Government Code that accomplish its constitutional directive, give district court judges in multicourt counties, including Harris County, flexibility to adopt local rules governing the courts' administration of cases. *See* TEX. GOV'T CODE § 24.024 (stating district courts "may adopt rules governing the filing and numbering of cases, the assignment of cases for trial, and the distribution of the work of the courts as in

13

their discretion they consider necessary or desirable for the orderly dispatch of the business of the courts"); TEX. GOV'T CODE § 74.093(a)–(b)(1) (requiring district court judges in multicourt counties to adopt local rules of administration governing "assignment, docketing, transfer, and hearing of all cases, subject to jurisdictional limitations of the district courts and statutory county courts"); *see also Davis v. State*, 519 S.W.3d 251, 255 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing TEX. CONST. art. V, § 11; TEX. GOV'T CODE §§ 24.003, 24.024, 74.093–094) (observing grant of "intra-county flexibility" to district court judges in multicourt counties).[6] Thus, in multicourt counties, like Harris County, a case may be assigned to a district court other than the court that empaneled the grand jury, pursuant to local rules. *See Allen*, 570 S.W.3d at 800; *see also Davis*, 519 S.W.3d at 255 ("If a grand jury in one district court returns an indictment in a case, the case nevertheless may be then assigned to any district court within the same county."); *Tamez v. State*, 27 S.W.3d 668, 670 n.1 (Tex. App.—Waco 2000, pet. ref'd) (noting that "the judges of the Harris County district courts exercising criminal jurisdiction have adopted a procedure by which indictments are filed in each court on a rotating basis without reference to the court which empaneled the grand jury presenting the indictments").

---

[6]     Clifton is not challenging Texas Government Code Sections 24.003, 24.024, 74.093, or 74.094.

14

## D.     Analysis

Clifton argues that his judgment of conviction is void because the grand jury presented the indictment against him to the 178th Trial Court, instead of the empaneling 176th District Court in violation of Article 21.02(2).  According to Clifton, Article V, Section 12(b) of the Texas Constitution incorporates by reference all "current statutes concerning indictments and informations," including Article 21.02(2) of the Texas Code of Criminal Procedure, and thus the requirements of Article 21.02(2) are constitutional in nature, not statutory.  Clifton argues that an indictment that runs afoul of Article 21.02 is a nullity that cannot vest jurisdiction in any court.  And because this is a jurisdictional issue, he may raise the issue for the first time on appeal.  *See Dunbar*, 297 S.W.3d at 780.[7]

In *Allen*, *Johnson*, and at least a dozen other opinions relied upon or cited by the State, this Court and the Fourteenth Court of Appeals consistently have held that a criminal district court in Harris County is not deprived of jurisdiction over a defendant when it receives presentment of an indictment from a grand jury impaneled by another criminal district court in the same county.  The same opinions hold that the same arguments Clifton raises in his first issue are non-jurisdictional procedural challenges to irregularities that a defendant may not raise for the first

---

[7]     Clifton concedes he is not arguing there is a procedural deficiency with the indictment.

15

time on appeal. *See Allen*, 570 S.W.3d at 801 (rejecting argument trial court lacked jurisdiction because indictment was presented by grand jury empaneled by different Harris County criminal district court and holding defendant's arguments "raise[d] a procedural issue related to his indictment"); *Johnson*, 562 S.W.3d at 174 (rejecting argument trial court lacked jurisdiction over his case because grand jury impaneled by different district court presented indictment to trial court, and holding that "[a]t best, appellant's arguments present a non-jurisdictional, procedural issue related to appellant's indictment"); *see generally Tamez*, 27 S.W.3d at 671 ("Settled case law establishes that a defendant may not complain for the first time on appeal that he has been tried and convicted in a court other than the one to which the indictment was returned.").[8]

---

[8] Although the State relies primarily on *Allen*, we have reached the same result in several other opinions. *See Henderson v. State*, 526 S.W.3d 818, 819–21 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (rejecting argument trial court never acquired jurisdiction over Henderson because grand jury from another Harris County district court presented indictment to trial court and holding there was no jurisdictional defect because indictment charged "a person" with commission of offense and there was evidence indictment was presented to Harris County District Clerk and trial court); *Davis v. State*, 519 S.W.3d 251, 254 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (rejecting argument trial court lacked jurisdiction over defendant, and thus judgment of conviction was void, because grand jury of different Harris County district court presented indictment to trial court, instead of court that empaneled grand jury); *see also Gutierrez v. State*, No. 01-18-00624-CR, 2020 WL 237935, at *1–3 (Tex. App.—Houston [1st Dist.] Jan. 16, 2020, pet. ref'd) (mem. op., not designated for publication) (holding trial court had jurisdiction over defendant when "underlying indictment was presented to the district clerk by the grand jury empaneled by the 178th District Court of Harris County, Texas" and rejecting argument that "text of the Texas Constitution and Texas Code of Criminal

16

Procedure contemplate that grand juries may return indictments only to the court that impaneled them"); *Payne v. State*, No. 01-16-00977-CR, 2018 WL 4190047, at *3 (Tex. App.—Houston [1st Dist.] Aug. 31, 2018, pet. ref'd) (mem. op., not designated for publication) (relying on *Henderson* and *Davis* and overruling argument trial court lacked jurisdiction because grand jury of different Harris County district court presented indictment to trial court because "relevant facts of this case do not differ materially from the relevant facts in *Henderson* and *Davis*"); *Shepherd v. State*, No. 01-16-00748-CR, 2017 WL 2813165, at *1 (Tex. App.—Houston [1st Dist.] June 29, 2017, pet. ref'd) (mem. op., not designated for publication) (holding argument trial court was not vested with jurisdiction because grand jury of another district court in Harris County presented indictment was "not a jurisdictional matter, Appellant's failure to challenge the indictment or the proceedings in the trial court constitutes a waiver of his right to challenge any procedural irregularity"); *Hernandez v. State*, No. 01-15-00837-CR, 2017 WL 1416877, at *2 (Tex. App.—Houston [1st Dist.] Apr. 20, 2017, pet. ref'd) (mem. op., not designated for publication) (holding argument trial court lacked jurisdiction because grand jury of different Harris County district court presented indictment could not be raised for first time on appeal and "Hernandez's failure to challenge the indictment or the proceedings in the 263rd District Court prior to trial constitutes a waiver of his right to challenge any procedural irregularity").

Although *Johnson* is the primary authority the States cites from the Fourteenth Court of Appeals, that court too reached the same result in several other opinions. *See Saldivar v. State*, 542 S.W.3d 43, 46 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (rejecting argument trial court lacked jurisdiction to adjudicate appellant's case because indictment was returned from grand jury impaneled by different district court and holding trial court was vested with jurisdiction when indictment returned by grand jury in different Harris County district court was presented to Harris County District Clerk and filed with trial court); *Matthews v. State*, 530 S.W.3d 744, 746–47 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (holding no jurisdictional defect because indictment was "written instrument presented to a court by a grand jury charging a person with the commission of an offense" and trial court was vested with jurisdiction after being presented with indictment returned by grand jury in different Harris County district court and filed with Harris County District Clerk); *see also Rodriguez v. State*, No. 14-16-00968-CR, 2018 WL 542239, at *2 (Tex. App.—Houston [14th Dist.] Jan. 25, 2018, no pet.) (mem. op., not designated for publication) (holding trial court had jurisdiction because indictment from different Harris County district court was presented to Harris County District Clerk and filed in trial court); *Quoc Nguyen v. State*, No. 14-17-00090-CR, 2017 WL 6329881, at *1 (Tex. App.—Houston [14th Dist.] Dec. 12, 2017, pet. ref'd) (mem. op., not designated for publication) (holding trial court was vested with jurisdiction when indictment presented to Harris County

17

In *Allen*, the defendant argued the trial court lacked jurisdiction over his criminal case because the indictment was presented to the trial court by a grand jury empaneled by a different Harris County criminal district court. *Allen*, 570 S.W.3d at 799. According to the defendant, "a grand jury impaneled by one trial court cannot present an indictment to a different trial court because a grand jury serves one particular court." *Id.* at 801. Rejecting this argument, this Court explained that district court judges in multicourt counties, like Harris County, are allowed to adopt local rules governing "the assignment of cases for trial" and "distribution of the work of the courts." *Id.* at 800 (quoting TEX. GOV'T CODE § 24.024); *see also* TEX. GOV'T CODE § 74.093 (stating local rules of administration may provide, in part, for assignment, docketing, transfer, and hearing of cases). Thus, in multicourt counties, "one court may impanel a grand jury, and if an indictment is presented, the case may

District Clerk and trial court and empaneling court were Harris County district courts and "overrul[ing] for the reasons stated in *Saldivar* and *Matthews*"); *Conway v. State*, No. 14-17-00060-CR, 2017 WL 5472642, at *1–2 (Tex. App.—Houston [14th Dist.] Nov. 14, 2017, no pet.) (mem. op., not designated for publication) (holding no jurisdictional defect when indictment returned by grand jury for different Harris County district court was presented to Harris County District Clerk and filed with trial court); *Aguillon v. State*, No. 14-17-00002-CR, 2017 WL 3045797, at *1–3 (Tex. App.—Houston [14th Dist.] July 18, 2017, pet. ref'd) (holding trial court had jurisdiction over defendant's case when amended indictment of grand jury from different court was presented to District Clerk and "refile[d]" in trial court, which had "first-filed related case;" stating "indictment's return to [trial court] conferred that court's jurisdiction over the indictment, since all state district courts located within one county have proper jurisdiction to decide the same cases;" rejecting argument trial court was divested of jurisdiction when presented with indictment prepared by grand jury impaneled by different district court; holding record failed to demonstrate jurisdiction defect).

18

be filed in another court of competent jurisdiction within the same county." *Allen*, 570 S.W.3d at 800.

The *Allen* court similarly held that the trial court "was properly vested with jurisdiction over Allen." *Id.* at 801. In support of its holding, this Court observed that the trial court and empaneling court were both Harris County criminal district courts, and thus both courts had the same subject matter jurisdiction and the same district clerk. *Id.* at 800. This Court also relied on that the fact the State filed the complaint against Allen in the trial court, the empaneling court's grand jury "returned a true bill of indictment concerning" the conduct alleged in the complaint, the "indictment was presented to the Harris County District Clerk, as demonstrated by the clerk's original file stamp," and it was filed in the trial court. *Id.*; *see also Shepherd v. State*, No. 01-16-00748-CR, 2017 WL 2813165, at *1 (Tex. App.— Houston [1st Dist.] June 29, 2017, pet. ref'd) (mem. op., not designated for publication) ("After the grand jury votes concerning presentment of an indictment, the State can file in any court that has jurisdiction over the case."); TEX. CODE CRIM. PROC. art. 4.16 ("When two or more courts have concurrent jurisdiction of any criminal offense, the court in which an indictment or a complaint shall first be filed shall retain jurisdiction . . . ."). This Court held the evidence "the grand jury foreman signed the indictment, the trial court directed the State to read the indictment to Allen in open court pretrial, and [the trial court] accepted Allen's plea of 'not guilty,'" was

"additional evidence that the indictment was acted upon by the grand jury and presented to, or received by," the trial court. *Allen*, 570 S.W.3d at 801; *see also* TEX. CODE CRIM. PROC. art. 12.06 (stating presentment occurs when indictment "has been duly acted upon by the grand jury and received by the court").

The *Allen* court further held that the defendant's argument that "a grand jury impaneled by one trial court cannot present an indictment to a different trial court because a grand jury serves one particular court," had been "expressly rejected" by this Court "on at least four previous occasions" and by the Fourteenth Court of Appeals. *Allen*, 570 S.W.3d at 801 (citing *Henderson*, 526 S.W.3d at 819–21; *Shepherd*, 2017 WL 2813165, at *1; *Hernandez v. State*, No. 01-15-00837-CR, 2017 WL 1416877, at *2 (Tex. App.—Houston [1st Dist.] Apr. 20, 2017, pet. ref'd) (mem. op., not designated for publication); and *Davis*, 519 S.W.3d at 254–56). "We have repeatedly held that a trial court is not deprived of jurisdiction over a criminal defendant in these circumstances." *Id.*

The *Allen* court also observed that the defendant's arguments "raise[d] a procedural issue related to his indictment," and the defendant's "failure to object to the indictment or the proceedings in the trial court . . . waive[d] . . . his right to challenge any procedural irregularity related to his indictment on appeal." *Id.* at 801–02 (citing *Henderson*, 526 S.W.3d at 821; *Shepherd*, 2017 WL 2813165, at *1; *Hernandez*, 2017 WL 1416877, at *2; *Davis*, 519 S.W.3d at 254–56). Although this

20

Court in *Allen* did not explicitly state the nature of the procedural issue, the authority relied upon indicates the procedural issue involved a challenge to the transfer of criminal cases between the district courts of Harris County. *See Henderson*, 526 S.W.3d at 821 ("The fact that appellant was indicted by a grand jury impaneled by one court and tried in another court without a motion to transfer the case to the trial court is, at best, a procedural issue."); *Hernandez*, 2017 WL 1416877, at \*2 (holding argument "grand jury serves a particular court, not a particular county, and therefore, when the 184th District Court's grand jury presented the indictment, it did not vest jurisdiction over the case in the 263rd District Court" amounted to procedural challenge to transfer of case with Harris County that was waived unless raised before trial); *Davis*, 519 S.W.3d at 256 (holding "[a]ny procedural challenge to the transfer of a case within a county is thus determined and resolved by proper application of local rule promulgated pursuant to constitutional and statutory authority; it is not a jurisdictional defect"); *see also Shepherd*, 2017 WL 2813165, at \*1 ("Because this is not a jurisdictional matter, Appellant's failure to challenge the indictment or the proceedings in the trial court constitutes a waiver of his right to challenge any procedural irregularity.").[9]

---

[9] *See also Mosley v. State*, 354 S.W.2d 391, 393–94 (Tex. Crim. App. 1962) (rejecting "jurisdictional" challenge where defendant was tried and convicted in district court other than one that empaneled grand jury even though record contained no transfer order); *Tamez v. State*, 27 S.W.3d 668, 671 (Tex. App.—Waco 2000, pet. ref'd)

The State filed the complaint against Clifton in the 178th Trial Court, alleging Clifton had committed the offense of aggravated assault of a family member. A grand jury, empaneled by the 176th District Court, returned a true bill of indicment. The indictment against Clifton was delivered, or presented, to the Harris County District Clerk, as demonstrated by the clerk's office's original file stamp, and it was filed in the county's 178th Trial Court. *See Allen*, 570 S.W.3d at 800–01; *see also* TEX. CODE CRIM. PROC. art. 20A.303 ("When an indictment is ready to be presented, the grand jury shall, through the foreperson, deliver the indictment to the judge or court clerk."). The record reflects that the indictment was "presented" to, or received by, the judge of the 178th Trial Court and acted upon by the grand jury because the grand jury foreman signed the indictment, and the judge of the 178th Trial Court directed the State to read the indictment to Clifton in open court prior to trial and accepted Clifton's not guilty plea. *See* TEX. CODE CRIM. PROC. art. 12.06 ("An indictment is considered as 'presented' when it has been duly acted upon by the grand jury and received by the court."); *Allen*, 570 S.W.3d at 800–01; *Henderson*, 526 S.W.3d at 820 ("Logically, appellant's arraignment in the present case could not

(holding argument trial court's judgment was void because grand jury empaneled by different Harris County district court presented indictment "concerns a procedural irregularity which he should have raised in a pre-trial motion before he pleaded guilty to the allegations of that indictment").

22

have occurred in the 177th District Court if the trial court had not actually received the indictment.").

The indictment meets the constitutional definition of an indictment because it charged (1) Clifton, a person (2) with the commission of the offense of aggravated assault of a family member. *See* TEX. CONST. art. V, § 12(b); *see Jenkins*, 592 S.W.3d at 898 ("To meet the definition of indictment under article V, section 12(b) of the Texas Constitution and to vest the court with both personal and subject matter jurisdiction, the indictment must (1) charge a person, and it must (2) charge the commission of an offense.").

The record thus reflects that the indictment was presented to the 178th Trial Court thereby vesting the court with jurisdiction over Clifton. *See Jenkins*, 592 S.W.3d at 898 (citing TEX. CONST. art. V, § 12(b)) ("The presentment of a valid indictment vests the district court with jurisdiction of the cause."); *see also Allen*, 570 S.W.3d at 801; TEX. CODE CRIM. PROC. art. 4.05 ("District courts and criminal district courts shall have original jurisdiction in criminal cases of the grade of felony. . ."). We thus hold there is no jurisdictional defect in the indictment. *See Henderson*, 526 S.W.3d at 820–21 (holding no jurisdictional defect because indictment charged "a person" with commission of offense and there was evidence indictment was presented to Harris County District Clerk and trial court). Moreover, because Clifton's argument challenges, at most, a procedural defect, he was required

23

to preserve this issue in the trial court by raising the issue before trial. Clifton did not do so. He thus waived his first issue. *See Allen*, 570 S.W.3d at 800–01.

Clifton argues that *Allen* is inapposite because it does not address the mandatory requirement in Article 21.02(2) that an indictment be "presented in the district court of the county where the grand jury is in session." Although we have not addressed whether a violation of Article 21.02 constitutes a jurisdictional defect, the Texas Court of Criminal Appeals held in *Jenkins v. State* that the failure to comply with Article 21.02 does not deprive a court of jurisdiction. *See Jenkins*, 592 S.W.3d at 902 ("We conclude, therefore, that, although defective under article 21.02, the indictment nevertheless (1) charges a person (2) with committing an offense, and thus vested the trial court with both personal and subject-matter jurisdiction.").

In *Jenkins*, the defendant argued the trial court lacked jurisdiction over him because his name did not appear in the indictment, and therefore, the indictment did not charge "a person" with an offense and was void. *See id.* at 898. The defendant, who acknowledged that his name was included in the document's caption, argued that the caption was not part of the indictment, and thus, the indictment against him did not charge him or any "person" with an offense. *See id.* at 900. The court of appeals agreed, relying in part on Article 21.02(4). *See id.*; TEX. CODE CRIM. PROC. art. 21.02(4) (stating sufficient indictment "must contain the name of the accused").

The Court of Criminal Appeals disagreed with the court of appeals and held that while the indictment was defective because it did not "contain the name of the accused," as required by Article 21.02(4), the defect did not render the indictment void. *See Jenkins*, 592 S.W.3d at 901 ("Because article 21.02 sets out what is required to make the indictment "sufficient," if an indictment does not comply with article 21.02, it is considered to be defective.").

The Court stated:

> It has been well-settled since 1985 that a defect in an indictment may not prevent it from qualifying as an indictment. An indictment can be defective, but still be an indictment that vests the court with jurisdiction. In fact, in *Duron v. State*, this Court held that in order for a defect to "render the instrument a non-indictment," the defect must "make it impossible for the defendant to know with what offense he had been charged."

*Id*. The Court further held that an indictment's failure to comply with Article 21.02 amounts to a defect in form that must be raised before the first day of trial or else the issue is waived. *See id.* at 902 ("If a defendant does not object to a defect, error, or irregularity of form or substance in an indictment before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other post-conviction proceeding.").

Clifton objected to the indictment based on the alleged failure of the grand jury to comply with Article 21.02(2) for the first time on appeal. He thus waived the

issue. *See id.* at 901–02. And even if he had not waived the issue, Clifton would not prevail on appeal because the requirements of Article 21.02(2) were satisfied when the grand jury presented the indictment to the 178th Trial Court. Article 21.02, which sets forth the requirements for a sufficient indictment, states: "An indictment shall be deemed sufficient if it has the following [nine] requisites," including that "[i]t must appear that the [indictment] was presented in the district court of the county where the grand jury is in session." TEX. CODE CRIM. PROC. art. 21.02(2). Clifton argues that Article 21.02(2) requires the grand jury "to present the indictment in the [same] district court where the grand jury is in session." The plain language of Article 21.02(2), however, requires that an indictment be "presented in the district court *of the county* where the grand jury is in session." *Id.* (emphasis added). The 176th District Court and the 178th Trial Court are both district courts of Harris County, the county where the grand jury was in session, and thus the presentment of the indictment to either court satisfies the requirement of Article 21.02(2) that an indictment be "presented in the district court of the county where the grand jury is in session." *Id.*

We overrule Clifton's first issue.

**Sections 54A.006(d) and 54A.008(a)(15) of the Texas Government Code**

In his second issue, Clifton argues "that the statutory authority bestowed upon associate judges by the Legislature [in Sections 54A.006(d) and 54A.008(a)(15) of

26

the Texas Government Code] violates Article V, Section 7 of the Texas Constitution." According to Clifton, Article V, Section 7 of the Texas Constitution prohibits associate judges "from handling voir dire in this case or in any other case" and thus, "a conviction arising from any jury trial in which voir dire was conducted by an associate judge is void."[10]

## A. Applicable Law

Texas district courts derive their "judicial power" from Article V of the Texas Constitution. TEX. CONST. art. V, § 1 ("The judicial power of this State shall be vested in one Supreme Court, in one Court of Criminal Appeals, in Courts of Appeals, in District Courts, in County Courts, in Commissioners Courts, in Courts of Justices of the Peace, and in such other courts as may be provided by law."); TEX. CONST. art. V, § 8 (granting district courts jurisdiction). Among other things, Article V, Section 7 requires that the state be divided into judicial districts which will be

---

[10]    Clifton also argues that "the practice violates his guarantee to a jury trial as explicated in Article I, Section 10," because "[i]t seems obvious that a constitutionally guaranteed jury trial must be presided over by an appropriate judicial officer." *See* TEX. CONST. art. I, § 10 ("In all criminal prosecutions the accused shall hav[e] a speedy public trial by an impartial jury."). Clifton, who does not dispute that he received a "speedy public trial by an impartial jury," does not cite to any authority for the proposition that a defendant is deprived of his right to a "speedy public trial by an impartial jury" when he receives a trial that meets the requirements of Article I, Section 10, but the trial is nevertheless defective because it violates a separate constitutional requirement.

27

presided over by duly elected judges, and it sets forth the eligibility requirements for such district court judges.  Article V, Section 7 states:

(a)     The State shall be divided into judicial districts, with each district having one or more Judges as may be provided by law or by this Constitution.

(b)     Each district judge shall be elected by the qualified voters at a General Election. To be eligible for appointment or election as a district judge, a person must:

(1)     be a citizen of the United States and a resident of this State;

(2)     be licensed to practice law in this State;

(3)     have been a practicing lawyer or a Judge of a Court in this State, or both combined, for eight years next preceding the judge's election, during which time the judge's license to practice law has not been revoked, suspended, or subject to a probated suspension;

(4)     have resided in the district in which the judge was elected for two years next preceding the election; and

(5)     reside in the district during the judge's term of office.

(c)     A district judge shall hold the office for the term of four years and shall receive for the judge's services an annual salary to be fixed by the Legislature.

(d)     A District Court shall conduct its proceedings at the county seat of the county in which the case is pending, except as otherwise provided by law. The Court shall hold the regular terms at the County Seat of each County in the Court's district in such manner as may be prescribed by law. The Legislature shall have power by General or Special Laws to make such provisions concerning the terms or sessions of each District Court as it may deem necessary.

(e) The Legislature shall also provide for the holding of District Court when the Judge thereof is absent, or is from any cause disabled or disqualified from presiding.

TEX. CONST. art. V, § 7.

The Texas Legislature may enact any laws not expressly or inferentially prohibited by the Texas Constitution or the United States Constitution. *See Jones v. Williams*, 45 S.W.2d 130, 137 (Tex. 1931) ( "Legislature can enact all laws not prohibited by the Constitution, either in express terms or by necessary implication."); *see also Brown v. City of Galveston*, 75 S.W. 488, 496 (Tex. 1903) (noting "the well-settled principle of constitutional construction that the power of the Legislature can be restrained only by a prohibition expressed or implied from some provision or provisions of the Constitution itself"). Section 54A.006(d) of the Texas Government Code states: "An associate judge may select a jury. Except as provided in Subsection (b), an associate judge may not preside over a trial on the merits, whether or not the trial is before a jury." TEX. GOV'T CODE § 54A.006(d). Section 54A.008(a)(15) of the Texas Government Code states: "Except as limited by an order of referral, an associate judge to whom a case is referred may . . . select a jury." *Id.* § 54A.008(a)(15).

## B. Preservation

Clifton cites to *Morrow v. Corbin*, 62 S.W.2d 641, 644 (Tex. 1933), for the proposition that a district court's jurisdiction "embraces the power to hear and

29

determine the matter in controversy." *Id.* (internal quotation marks omitted). Clifton argues that "the judicial power exercised by district courts includes the power to 'hear' cases." He posits that because an "elected district judge presides over the district court[,] it is the district judge who 'hears' cases over which the district court has jurisdiction." He argues that because conducting voir dire is an integral part of hearing a case, "only district judges may hear cases." Clifton thus concludes that "associate judges may not conduct voir dire" and a "conviction arising from any jury trial in which voir dire was conducted by an associate judge is void."

Citing to *Davis v. State*, 956 S.W.2d 555 (Tex. Crim. App. 1997), the State responds that "a complaint about the authority of an individual to act as judge" is not a challenge to the court's jurisdiction and thus it cannot be raised for the first time on appeal "unless the complaint goes to [the individual's] constitutional disqualifications." The State argues that Clifton waived his challenge to the associate judge's authority to conduct voir dire because he is not challenging the qualifications of the associate judge. The State further contends that even if Clifton had preserved this issue for review, he would not prevail because the Texas Constitution does not give elected district court judges the exclusive authority to preside over a district court and "Texas case law is replete with examples of people other than the elected district judge presiding over a case."

30

Clifton acknowledges that while a challenge to the "power of the person presiding over a court is not jurisdictional" and cannot be challenged for the first time on appeal, he clarifies that he is "not making a jurisdictional argument." "Rather, [Clifton] is arguing that the statutory authority bestowed upon associate judges by the Legislature violates Article V, Section 7 of the Texas Constitution."[11] Clifton further argues that the State's reliance on *Davis* is misplaced because while *Davis* states that only a challenge to a judge's constitutional qualifications may be raised for the first time on appeal, *Davis* also recognizes that "judicial functions performed by one without any authority to act" may be either void or voidable. *See Davis*, 956 S.W.2d at 559.

In *Davis*, the Court explained:

While our case law has called the authority of the judge to preside a jurisdictional issue, we now disavow that characterization, because as we have explained, jurisdiction or judicial power is vested in courts, not individuals. This is not to say that judicial functions performed by one without any authority to act may not be void. For example, if the trial judge is related to a party by affinity or consanguinity or had formerly prosecuted the same case he now presides over, he is constitutionally

---

[11] A defendant may not challenge the constitutionality of a statute for the first time on appeal. *See Reynolds v. State*, 423 S.W.3d 377, 383 (Tex. Crim. App. 2014) (holding "[a]s applied" constitutional challenges must be preserved by objection or complaint to trial court); *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009) ("[A] defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a statute."). Clifton did not challenge the constitutionality of Sections 54A.006(d) and 54A.008(a)(15) of the Texas Government Code in the trial court. To the extent his brief can be construed as a challenge the constitutionality of these statutes on appeal, neither constitutional challenge was preserved for appellate review, and thus Clifton waived these issues.

31

disqualified under Article V, Section 11. *See Ex parte Vivier*, 699 S.W.2d 862 (Tex. Cr[im]. App. 1985); *Ex parte Washington*, 442 S.W.2d 391 (Tex. Cr[im]. App. 1969). In *French v. State*, 572 S.W.2d 934 (Tex. Cr[im]. App. 1978) (on second motion for rehearing), a temporary appointed municipal judge's actions were held void because he had not taken the oath of office as required for elected judges and appointed officers by Article XVI, Section 1, Texas Constitution.[12] Therefore, as opposed to being disqualified from acting in a particular case, the special judge in *French* was not qualified because he had not taken the constitutionally required oath. *See also Herrod v. State*, 650 S.W.2d 814 (Tex. Cr[im]. App. 1983) (retired judge was not authorized to preside because record failed to show: an order of assignment from the administrative judge, that the duly elected judge was disabled, and that the retired judge had executed the bond and taken the oath of office). *But see Buchanan v. State*, 471 S.W.2d 401 (Tex. Cr[im]. App. 1971) (absent showing to the contrary, court presumes that retired judge was properly assigned to the case).

*Id.* The *Davis* court observed:

> Common to all of the above cases which hold the conviction void is the constitutional or statutory *disqualification* or lack of *qualification* of the judge. If the putative judge did not possess the prescribed qualifications to act in that capacity or he was disqualified from a particular case because of his relationship to the case or a party, he had no authority over the proceedings and his actions were a nullity.

---

[12]  In *French v. State*, 546 S.W.2d 612 (Tex. Crim. App. 1977), the defendant's residence was searched. The evidence was seized pursuant to a search warrant issued by an appointed municipal judge who had not taken the oath of office. The court held that because the municipal judge had not taken the oath of office, the search warrant he issued was void and the evidence seized was not admissible. *Id.* at 614; *see also French v. State*, 572 S.W.2d 934 (Tex. Crim. App. 1977) (op. on reh'g) (overruling first motion for rehearing). Thus, the trial court abused its discretion by revoking the defendant's probation based on this inadmissible evidence. *French*, 546 S.W.2d at 614 (reversing and remanding).

*Id.* (emphasis in original); *see also Mata v. State*, 991 S.W.2d 900, 902 (Tex. App.—Beaumont 1999, pet. ref'd) ("The actions of a judge without authority are void if the judge is either *disqualified*, or *is not qualified.* [*Davis*, 956 S.W.2d] at 559. Otherwise, the actions are merely voidable and must have been objected to in order to be preserved for appeal.").

Clifton, who agrees that only a complaint about the qualifications of a judicial actor may be raised for the first time on appeal, asserts:

> [H]e is not complaining about the associate judge's qualifications to be an associate judge. But contrary to what the State says, a complaint about a judicial actor's qualifications are not the only complaints that need not be preserved. As the *Davis* Court makes clear, the key inquiry is whether our Constitution disqualifies the judicial actor from taking the action in question. And here, that is precisely Mr. Clifton's complaint. He is asserting that the associate judge is barred by the Texas Constitution from handling voir dire in this case or in any other case.

We understand Clifton to argue that his conviction is void because the Texas Constitution allows only district court judges to conduct voir dire and thus the associate judge who conducted voir dire in his case was not qualified to perform that judicial function. Clifton may challenge a void judgment for the first time on appeal. *See Nix*, 65 S.W.3d at 668 (stating void judgments in criminal cases are nullities and may be attacked at any time).

## C. Analysis

Although Article V, Section 7 of the Texas Constitution authorizes elected district court judges to preside over cases pending in district courts, Article V,

33

Section 7 neither vests district court judges with the exclusive authority to do so nor expressly prohibits an unelected judge, including an associate judge, from presiding over any aspect of a felony trial,[13] including conducting voir dire. TEX. CONST. art. V, § 7. Thus, contrary to Clifton's arguments, the plain language of the Texas Constitution does not bar associate judges from conducting voir dire in criminal cases. *See Johnson v. Tenth Jud. Dist. Ct. of Appeals at Waco*, 280 S.W.3d 866, 872 (Tex. Crim. App. 2008) ("As with statutory construction, when we construe a provision of the Texas Constitution, we are principally guided by the language of the provision itself . . . ."); *see also Fain v. State*, 986 S.W.2d 666, 672 (Tex. App.—Austin 1998, pet. ref'd) ("When interpreting our state constitution, we rely heavily on its literal texts, and are to give effect to its plain language."). Because the Texas Constitution did not bar the associate judge from conducting voir dire in Clifton's

---

[13] "Criminal district courts have original jurisdiction in felony criminal cases." *Henderson*, 526 S.W.3d at 820; *see* TEX. CODE CRIM. PROC. art. 4.05 ("District courts and criminal district courts shall have original jurisdiction in criminal cases of the grade of felony, of all misdemeanors involving official misconduct, and of misdemeanor cases transferred to the district court under Article 4.17 of this code."); *see also* TEX. CONST. art. V, § 8 ( "District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body.").

case, she was not disqualified from performing this function, and thus her actions were not void.[14]

We overrule Clifton's second issue.

## Admission of Evidence

In his third issue, Clifton argues the trial court abused its discretion by finding he was barred from asserting his rights under the Sixth Amendment's Confrontation Clause or objecting to the admission of Sanders' out-of-court statements as hearsay based on the doctrine of forfeiture by wrongdoing. Clifton contends that, at most, the evidence demonstrates that it was his mother that bribed Sanders not to attend trial, not him.

In his fourth issue, Clifton argues the trial court abused its discretion by admitting Sanders' out-of-court statements included in a report prepared by emergency medical personnel (State Exhibit 55) and Sanders' hospital records (State Exhibit 56). He argues that the admission of these statements violated his rights under the Sixth Amendment's Confrontation Clause because Sanders was not available to be cross-examined about the statements.[15]

---

[14] Clifton does not dispute that the associate judge was authorized by statute to conduct voir dire. *See* TEX. GOV'T CODE § 54A.006(d) ("An associate judge may select a jury."); *id.* § 54A.008(a)(15) ("Except as limited by an order of referral, an associate judge to whom a case is referred may . . . select a jury.").

[15] Clifton suggests that the doctrine of forfeiture by wrongdoing does not apply to State Exhibits 55 and 56 because they were not the subject of the Article 38.49 hearing conducted by the trial court.

35

The State argues that the doctrine of forfeiture by wrongdoing allowed the admission of Sanders' out-of-court statements, including State Exhibits 55 and 56, because Clifton wrongfully procured Sanders' unavailability at trial.

## A.    Standard of Review and Applicable Law

The Confrontation Clause of the Sixth Amendment guarantees an accused the right to confront the witnesses against him. *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015).   Under the Confrontation Clause, "testimonial" statements—statements that were made under circumstances that would lead an objective witness to reasonably believe they would be available for use at a later trial—are inadmissible at trial unless the witness who made them either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Id.*

Under the doctrine of forfeiture by wrongdoing, a defendant is barred from objecting to a witness' out-of-court statements based on the Confrontation Clause or hearsay when he wrongfully procures the witness' unavailability at trial. *Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019).  This exception applies only when the defendant "engaged in conduct designed to prevent the witness from testifying." *Giles v. California*, 554 U.S. 353, 359, 365 (2008) (explaining that absence of forfeiture rule for such conduct "would create an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them").  The doctrine

of forfeiture by wrongdoing is based on the principle that tampering with a witness "should . . . estop the tamperer from making any objection based on the results of his own chicanery." *Colone*, 573 S.W.3d at 264 (quotation omitted); *see generally Davis v. Washington*, 547 U.S. 813, 833 (2006) (stating doctrine of forfeiture by wrongdoing extinguishes confrontation claims on equitable grounds and noting that "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.").

Texas Code of Criminal Procedure Article 38.49 codifies the doctrine of forfeiture by wrongdoing. It states that:

> (a) A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:
>
> > (1) may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence and testimony; and
> >
> > (2) forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing.
>
> (b) Evidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are admissible and may be used by the offering party to make a

showing of forfeiture by wrongdoing under this article, subject to Subsection (c).

(c)     In determining the admissibility of the evidence or statements described by Subsection (b), the court shall determine, out of the presence of the jury, whether forfeiture by wrongdoing occurred by a preponderance of the evidence. If practicable, the court shall make the determination under this subsection before trial using the procedures under Article 28.01 of this code[16] and Rule 104, Texas Rules of Evidence.[17]

(d)     The party offering the evidence or statements described by Subsection (b) is not required to show that:

(1)     the actor's sole intent was to wrongfully cause the witness's or prospective witness's unavailability;

(2)     the actions of the actor constituted a criminal offense; or

(3)     any statements offered are reliable.

(e)     A conviction for an offense under Section 36.05 or 36.06(a), Penal Code, creates a presumption of forfeiture by wrongdoing under this article.[18]

(f)     Rule 403, Texas Rules of Evidence, applies to this article.[19] This article does not permit the presentation of character evidence that

---

[16]     Article 28.01 addresses what matters may be heard during a pretrial hearing. TEX. CODE CRIM. PROC. art. 28.01.

[17]     Texas Rule of Evidence 104 addresses preliminary questions the trial court decides, such as whether a witness is qualified, whether a privilege exists, or whether evidence is admissible. TEX. R. EVID. 104(a).

[18]     TEX. PENAL CODE § 36.05(a) (witness tampering); *id.* § 36.06(a) (obstruction or retaliation).

[19]     Texas Rule of Evidence 403 states that a trial court may exclude evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403.

would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law.

TEX. CODE CRIM. PROC. art. 38.49. The federal equivalent of Article 38.49 is Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine under federal law. Federal Rule of Evidence 804(b)(6) states: "A statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result" is not excluded by the rule against hearsay if the declarant is unavailable as a witness. FED. R. EVID. 804(b)(6). Thus, under both Texas and federal law, the doctrine of forfeiture by wrongdoing applies when a defendant engages in conduct that was intended to, and did, cause the unavailability of a witness or when the defendant acquiesces to such wrongdoing. *See* TEX. CODE CRIM. PROC. art. 38.49(b); FED. R. EVID. 804(b)(6); *see also United States v. Rivera*, 412 F.3d 562, 567 (4th Cir. 2005) (stating "[a]ctive participation or engagement . . . is not required" for forfeiture-by-wrongdoing to apply); *United States v. Thompson*, 286 F.3d 950, 963–64 (7th Cir. 2002) (imputing co-conspirators actions to defendant for purposes of Rule 804(b)(6)); *United States v. Cherry*, 217 F.3d 811, 820 (10th Cir. 2000) (same); *Olson v. Green*, 668 F.2d 421, 429 (8th Cir. 1982) (stating defendant "or someone acting on his behalf may waive or forfeit [defendant's] right" to confront accuser).

Because the forfeiture by wrongdoing doctrine concerns the admission of otherwise inadmissible evidence, we utilize the abuse of discretion standard in

reviewing a trial court's admission of evidence under the doctrine. *See Shepherd v. State*, 489 S.W.3d 559, 572–73 (Tex. App.—Texarkana 2016, pet. ref'd). We will uphold the trial court's ruling if there is some evidence to support the trial court's decision and it is correct under any theory of law applicable to the case. *See Armendariz v. State*, 123 S.W.3d 401, 405 (Tex. Crim. App. 2003) (stating appellate courts must uphold evidentiary rulings if they are correct under any theory of law supported by record regardless of what reason trial court gives); *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002) (stating trial court does not abuse its discretion by admitting evidence if there is some evidence to support trial court's decision). If the trial court does not issue findings of fact, we review the evidence in the light most favorable to the trial court's ruling and assume the court made findings that are supported by the evidence. *Shepherd*, 489 S.W.3d at 572–73; *see also Schindler v. State*, No. 02-17-00241-CR, 2018 WL 4924946, at *6 (Tex. App.—Fort Worth Oct. 11, 2018, pet. ref'd) (mem. op., not designated for publication) (stating that during Article 38.49 hearing, trial court is sole trier of fact and judge of credibility of witnesses and weigh given their testimony). "When assessing evidence regarding acts alleged to have procured a witness' unavailability, we draw all reasonable inferences in favor of the trial court's finding." *Byrd v. State*, No. 07-20-00234-CR, 2022 WL 2719060, at *6 (Tex. App.—Amarillo July 13, 2022, pet. ref'd)

40

(mem. op., not designated for publication) (citing *Brown v. State*, 618 S.W.3d 352, 355 (Tex. Crim. App. 2021)).

**B.    Texas Code of Criminal Procedure Article 38.49 Hearing**

As required by the statute, the trial conducted an Article 38.49 hearing outside the presence of the jury.    The State presented testimony from: Sergeant Mark Schmidt, Investigator Bilsen Espinosa, Deputy Norman Fitts, and Caseworker Maria Bahena.

### 1.    Sergeant Mark Schmidt

Sergeant Mark Schmidt ("Sergeant Schmidt") with the Harris County Sheriff's Office is an administrator of the county's Inmate Phone System.  Sergeant Schmidt testified that inmates are allowed to make outgoing phone calls, but they must enter a pin number before dialing a phone number and all outgoing inmate phone calls are recorded.  The inmate's pin number is a combination of the inmate's eight-digit system person number ("SPN"), which is unique to that inmate, plus six additional numbers. Sergeant Schmidt testified that inmates commonly use other inmate SPNs to make phone calls.

According to Sergeant Schmidt, on August 18 and 19, 2022, an inmate placed a call to Clifton's mother, Viola Clifton ("Viola"), using a SPN belonging to an inmate assigned to Clifton's cell block.  A DVD containing audio recordings of these phone calls was admitted later in the hearing (State Exhibit 5).

### 2. Investigator Bilsen Espinosa

Investigator Bilsen Espinosa ("Investigator Espinosa"), with the Harris County District Attorney's Office's Domestic Violence Division, testified that one of his responsibilities is coordinating witnesses for trial, including issuing subpoenas and making travel and lodging arrangements for witnesses. Investigator Espinosa testified that he issued a subpoena to Sanders on August 18, 2022, and Sanders met with the State on August 20, 2022. The trial court admitted a recording of Sanders's Zoom meeting with the State on August 20, 2022 (State Exhibit 8). Investigator Espinosa testified that during that meeting, Sanders provided more details about the assault, and she asked about court attire and logistical matters pertaining to her testimony.

According to Investigator Espinosa, Sanders, who had been "very cooperative" until that time, did not respond to District Attorney's Office's attempts to contact her after the August 20, 2022 meeting.

### 3. Deputy Norman Fitts

Deputy Norman Fitts ("Deputy Fitts"), an investigator with the Harris County Sheriff's Office, interviewed Sanders at Southwest Memorial Hospital the night of the assault. According to Deputy Fitts, Sanders was "traumatized" and had several severe injuries. Sanders gave a recorded statement to Deputy Fitts which the trial

court admitted for purposes of the hearing (State Exhibit 10). Sanders gave Deputy Fitts a detailed description of the assault and she named Clifton as her assailant.

Sanders told Deputy Fitts that she was afraid of Clifton, and she wanted to press charges against him. The trial court also admitted photographs of Sanders depicting her injuries and the apartment where the incident occurred (State Exhibits 12, 13, 14, 15, 16, and 17).

### 4. Caseworker Maria Bahena

Maria Bahena ("Bahena"), a caseworker with the Harris County District Attorney's Office, testified that she spoke with Sanders ten times prior to trial. According to Bahena, Sanders, who asked her about getting a protective order, told Bahena she was concerned about her safety because "she was still receiving contact from the defendant's family, from the defendant through social media accounts." Sanders told Bahena she was being contacted by Clifton's mother, sister, and his other family members.[20]

---

[20] During the hearing, the trial court also admitted the following exhibits: (1) June 3, 2020 order granting the State's Motion of Bond Conditions, which among other things, prohibits Clifton from contacting Sanders (State Exhibit 1), (2) September 11, 2019 protective order which prohibits Clifton from "communicating directly with [Sanders] in a threatening or harassing manner" (State Exhibit 2), (3) Clifton's jail card which identifies his mother, Viola Clifton, as his next of kin and lists her telephone number (State Exhibit 3), and (4) the subpoena issued to Sanders (State Exhibit 18).

When Bahena spoke to Sanders on August 19, 2022, Sanders wanted to know how she could keep her personal information confidential and she asked about "any services that may assist her with the reimbursement for the childcare, and loss of work due to coming into court." Based on their conversation, Bahena believed Sanders would be flying in as scheduled for Clifton's trial.

### 5. Phone Calls from the Harris County Jail

During the hearing, the trial court admitted four DVDs containing audio recordings of phone calls Clifton made from the Harris County jail on the following dates: September 11, 2019; January 19, 24, and 26, 2022; April 14, 2022; and August 19, 21, and 24, 2022. The audio recordings also included phone calls Clifton placed on August 18 and 19, 2022, using the SPN belonging to another inmate in Clifton's cell block. The phones calls were admitted as State Exhibits 4, 5, 6, and 7. The trial court also admitted a transcription of portions of those phone calls as a demonstrative exhibit (State Exhibit 9).

After the State and Clifton rested, the trial court adjourned the hearing and reviewed the audio recordings in State Exhibits 4, 5, 6, and 7 at the times indicated in State Exhibit 9.

### (a) September 11, 2019

On September 11, 2019, Clifton called his mother Viola from jail over a recorded line. Clifton told Viola, "Call this girl ma, cause they say they throw this

44

case out, cause it ain't how it look." Viola asked him, "Who you want me to call? [Sanders]?" Clifton responded, "Yeah . . . I need her cell." Viola told him, "I wouldn't even call her. Let her know I'm up there. Don't even let her know you up there. They probably know how to get in touch with her." Clifton responded, "They can't." Later in the call Viola said, "You do not need to call that girl and let her know that you are up there." Clifton asked, "When is the last time you talk to her?" Viola told Clifton, "I haven't. She don't answer the phone no more."

### (b) January 19, 2022

On January 19, 2022, Clifton called Viola from jail. Viola told him, "I talked to [Sanders] today, she called me. She said [the] prosecutor called her today, and told [her] you were back in custody, and she told them that she is not coming to testify, she ain't doing nothing. So she told me." Clifton asked, "So what they say?" Viola responded, "I've been calling the attorney. First of all, no witness, no nothing. They ain't got nothing. They might as well release you." Later in the call, an unidentified female asked Clifton when he was coming home and Clifton responded, "I already called my mama. I ain't do that shit. She ain't going to testify."

### (c) January 24, 2022

On January 24, 2022, Clifton called Viola from jail. Clifton told Viola, "Don't call Jordan. Call J, so I can see what she talking about, what she said. Call J." Viola asked, "[Sanders]?" Clifton responded, "Yeah." Viola told Clifton, "Hold on. She

45

talked to the DA. She called me when she talked to them." Sanders then joined the call. Clifton greeted her, "Hey J." Sanders asked Clifton, "What's up?" Clifton responded, "Hey fool, look, check this out, right. I just came to court. I heard they told you [inaudible]. Hear me you ain't got to do . . . you ain't got to say . . ." Clifton also told Sanders, "Alright look, I'm going to set this junk for trial—they on some gay ass shit . . . they offered 12 years and shit. He told me that you [inaudible]. But they say the DA . . . whoever you told me you talked to, I just need you not to come and they will dismiss on my trial date." Sanders replied, "Alright. I already told them. They called me a couple of days ago. I told them I wasn't a part of it. Then they were like am I sure. I was like yeah. They said it is still up to the judge and that was all."

### (d) January 26, 2022

On January 26, 2022, Clifton called Viola from jail. A woman named Jordan told Clifton, "Quit irritating me." Clifton responded, "Fuck, I'm irritating you. How you shouldn't be irritated. You're free. I'm the one irritated. I'm in jail. I said text this number right there. I said grab your phone and text this number." Jordan said, "Not [Sanders]." Clifton told Jordan, "Nah, not texting that hoe. Fucking no. I'm going to call her for? We ain't got nothing to talk about for. We never have nothing to talk about. I'm just trying to make sure the hoe gonna do what she's supposed to do so that I'm back on the other side. Other than that we ain't have no conversations

46

with that hoe. I'm in this jam. Fuck. Be for real. I barely be wanting to talk to your ass. Why the fuck would I talk to her?" An unidentified female then asked Clifton, "Who am I texting? 346-756—who is it? I am not texting unless you tell me who it is." Clifton said, "What the fuck, why would I make you text the bitch. I am not that bold to tell you to text the bitch. Baby this ain't no bitch. The message say tell her Robert said can she put the money on my books . . . ."

**(e)     April 14, 2022**

On April 14, 2022, Clifton called Viola from jail. Seven minutes into the call, an unidentified female told Clifton, "She didn't answer. Hold on she calling back. There you go." Someone asked Clifton, "Hey you go to court?" and Clifton responded, "They talking about setting me for trial. I go to court in 2 1/2 months. Yeah I go." An unidentified female stated, "The girl—she said the same thing— they said the girl said she ain't going to show up ain't going forward with prosecution. They feel they can still force her to come to court. If she don't show up for court they try to dismiss that. He full of shit. Cause you should have got out."

At eight and a half minutes into the call, Viola states, "Shit when I talk to her she said she done with that." Clifton told her, "You need to make sure to let her know don't try to do no [indistinguishable]." Viola said, "They don't know how to get in touch with that girl they don't know her address. That lawyer is full of shit - they don't know how to get in contact with her. They need to dismiss that shit. You

47

let him know you know . . . hearsay can't stand in court. Tell him you know the law. They are going to be intimidated. He works for the state as well. If she don't show up to court it has to be dismissed as well." At ten and a half minutes, Clifton told Viola, "Hey try to call her though. You know what I am saying." Viola said, "I called. But you should be out." Viola told Clifton, "Tell your lawyer hearsay can't stand up in the court of law. The girl already said she won't show up to court. Y'all need to let me know. This is a waste of taxpayer money. Nah, they ain't going to take to trial. They ain't got no witness. They can't go on hearsay."

### (f) August 18, 2022

On August 18, 2022, Clifton called Viola using another inmate's SPN. When Viola answered the phone, Clifton asked her if "that lawyer called." Viola said, "Yeah, he called me. . . Don't listen. Play the game because tomorrow you gonna be released." Clifton said, "Look, look, you can talk on this call because this ain't my phone call, so they can't hear what we saying. I am on someone else's call, so they can't hear what we saying. This ain't recorded all the time . . . You need to umm get somebody to call that girl and make sure everything still . . . ." Viola interrupted Clifton and told him, "She ain't coming. She already said she is not coming." Clifton said, "When? That was a long time but you don't know if they scared her or what." Viola assured Clifton, "They ain't scare her Anthony. She ain't coming. Look. Tomorrow—I already told him you would take probation. If they

48

give you probation, you will take that or even time served. Don't let no judge sentence you to, or don't take nothing. I already told him the deal . . . I said you got nineteen months . . . I said tomorrow y'all can get him either time served or you can get him some probation. I said either or. I said I can bet you anything she's not going to show up. She's not coming. He said, well, she told me that." Clifton interrupted, "She told him what?" Viola said, "She had told him that. He said when he told her I talked to her, she told me wasn't coming. I said she's not going to show up." Clifton said, "He told . . . said that she told umm . . . that she said they gonna fly her out Wednesday. My trial start Thursday." Viola said, "Tomorrow he'll have a deal for you. Whatever you do, you stick to time served or probation. No, you're not going to let no judge sentence you. That's a no, cuz no you not gonna do that. Tomorrow when you go in there they ain't going to want to take you to trial. They aren't going to pay that money out for your ass . . .You ain't even from Texas . . .They ain't gonna pay for no jury trial for you . . . you ain't worth taxpayer money like that. Tomorrow, you will take probation or time served. That's it. Cause she ain't going to show up . . . they don't even know where that girl at." Viola assured him he would be "coming home tomorrow. I can tell from how [the lawyer] was talking." Clifton asked, "What did he say because he was trying to bluff me out." Viola told Clifton to insist on going to trial, "Guess what? They gonna come and say they will give you probation or time served."

49

### (g) August 19, 2022 at 3:48 pm

On Friday, August 19, 2022, the associate judge for the 178th Trial Court presided over voir dire in Clifton's case. Clifton, who had been in court for the proceeding, called Viola at 3:48 p.m. after he returned to the jail. During the call, Viola told Clifton, "That girl ain't coming to court, I am going to call her." Three minutes later, Clifton told someone, "[Sanders], I don't even talk to her. Her and I ain't on good terms." Clifton said, "The only person that I got, that I know for sure, that I can rely on, that's been in my corner, is my mama . . . I can't say what I am going to do cause you can't tell what [Sanders] is going to do, she might say yes and she might not come . . . She might say yeah, they change her mind and she wanna come. [Sanders] probably won't even answer the phone for my mama . . . [Sanders] won't even let Jordan call her, so I know that's out the window."

### (h) August 19, 2022 at 4:28 p.m.

An hour later at 4:28 p.m., Clifton called Viola using another inmate's SPN. Viola told Clifton that she had just spoken to Sanders and Sanders said that "they subpoenaed her to come." Viola said that when she asked Sanders if she was going to testify, Sanders said, "I don't know. I don't know what I am going to do." Clifton asked Viola, "Did you tell her that if she doesn't come, they will dismiss the case and then they can't do nothing to her?" Viola said, "Yeah." Clifton told Viola, "I'm on someone else's phone call. So call her. They can't trace this back to me. I'm on

someone else's phone call. So call her right quick." Viola told Clifton, "I believe if you would have never ever gave them—they wouldn't have been able to get in touch with that girl . . . a long time ago—if they wouldn't never had a way to get in contact with her—you gave them a way to get in contact with her."

Viola, who had apparently called Sanders and left a message, told Clifton, "She probably going to call me back. She said yeah they subpoena me to come to court, but I don't know what to do. But you're going to give . . . white folks . . . you know . . . so I said to her Jerika, Jerika, first of all, you was trying to hit him with the glass . . . ." Clifton interrupted Viola and asked her, "Why would you say that to her though? Why did you do that? Out of everything—that was the worst thing you could of ever said. Now you gonna make her." Viola told him, "You just pray she don't show up to court." Clifton urged Viola, "Just call her back one more time. Try to call her back one more time. I don't think she had her on the phone because if they had her on the phone they would have gave me another charge for violating a protective order."[21] A few seconds later, Clifton said, "Hello? She didn't answer? Hello?" Viola responded, "I don't think she's going to come to court." Clifton asked, "What did she say they told her?" Viola answered, "She said yeah they

---

[21]    The September 11, 2019 protective order, which was admitted during the Article 38.49 hearing, prohibits Clifton from "communicating directly with [Sanders] in a threatening or harassing manner." And the June 3, 2020 order granting the State's Motion of Bond Conditions prohibits Clifton from contacting Sanders.

51

subpoena her to court. If they subpoena her to court and she don't come . . . ." Clifton interrupted Viola, "The lawyer said they didn't subpoena her yet—she lying. They are calling to tell her to come to court. They don't know where she is. She is lying about that." Clifton asked Viola, "You talked to her though?" and Viola said, "Yeah, she called me back she called me twice, but her phone was messing up." Clifton asked, "So what else did she say?" Viola told him, "She will call me back. I should have let the lawyer talk to her." Clifton asked Viola, "Is she saying like she's going to come to court?" Viola told him, "She was like I don't know what I'm going to do. She said do I have to go?" Clifton asked, "What did you tell her?" Viola responded, "Yeah—I did tell her that—said you ain't got to go I don't think she coming [indistinguishable]." Clifton told Viola, "Them folks will give me 20 years. He said if I lose in trial they can give me twenty. The lowest I might get is 15 years if I lose in trial because I didn't take the 12." Clifton told Viola to "[t]ry to tell Miles to call off his phone." Viola assured Clifton, "You ain't going to go to trial, trust me." When Clifton asked if she was "calling the phone," Viola said, "She ain't answering no more. I don't think she is going to come to court. I just don't." Clifton told her, "If she's not coming to court—why is she not answering the phone. You got me scared. She got me scared. 'I don't know what I am going to do' what does she mean she don't know what she is going to do?"

When Viola told Clifton that she had to go, Clifton told her, "Wait what was it you told me you tell her? Why ain't you telling her man they trying to get him a lot of time. This case old. Y'all don't conversate no more or nothing. You can just leave this alone. You been moving on so like—why you ain't talk to [Sanders] like that."[22] Clifton then asked Viola "how long I be on that phone." Viola told him, "Not that long. Call back. I'm going to try to call her. Call back later on."

### (i)     August 21, 2022

On Sunday, August 21, 2022, Clifton called Viola. Viola asked Clifton if he was using his SPN, or someone else's and he told her it was "his call." Viola told him, "That girl ain't coming to court . . .You'll be home Thursday." Clifton said, "I know." When Clifton continued to ask for money for his jail spending account, Viola assured him that he will be "walking out of there Thursday." Viola said, "I talked to her for about 2 hours. She's not coming. You gonna call me from somebody else's phone?" Viola told him, "That girl ain't coming to court." Clifton asked, "How you know that?" Viola told Clifton, "I know she ain't. I gave her baby $2,000 worth of clothes. She said I am not coming. I am definitely not coming. She said I will not be there." Clifton asked, "How did you get it to her?" Viola responded, "How do you think? . . . I mailed it to her. It's going out, uh. We tried

---

[22]     The transcriber included the following notation: "This is not phrased as a suggestion. This is phrased tell her this when you talk to her."

53

to send it off yesterday, but she said the address was a PO box . . . so uh, we mailing it off where it get there next day, so she will get it Tuesday." Viola told Clifton, "And I don't see how a trial could go on without a witness. I ain't never heard of that in my life."

### (j) August 24, 2022

On Wednesday, August 24, 2022, the day before trial began, Clifton called Viola and told her he had spoken to his lawyer and the lawyer told him that if Sanders "don't show up they might be time served." Viola stated, "We know she ain't gonna show up . . . Ima call her again today." Clifton said, "Alright." Viola told him, "They already know [Sanders] ain't going to show up cuz they already know that if she were going to show up, she would be here now. And he would know if she was here. That girl told me yesterday she ain't coming. I am gonna to call her again and make sure she got her baby clothes because they was there."

### 6. Trial Court's Ruling

After hearing the testimony and reviewing State Exhibits 4, 5, 6, and 7 in chambers, the trial court found:

> In regards to the evidence submitted at this hearing, the Court finds that the State does indeed prove by a preponderance of the evidence the intent of the defendant to make the complainant unavailable for trial. And for those reasons, the State's motion is granted. And the State's seeking to admit the following evidence is therefore granted in regards to the complainant's statement to police detectives at the hospital. [State Exhibit 10]. Number two, the complainant's statement in a witness

54

meeting on August 20th of 2022 in regards to jail calls [State Exhibit 8].

### 7.    Statements from Sanders Admitted During Trial

When Sanders failed to appear for trial, the State offered into evidence a DVD containing an audio recording of the statement Sanders gave to Deputy Fitts at the hospital. Clifton objected to the admission of the DVD based on hearsay and the Confrontation Clause. The trial court overruled Clifton's objections and admitted State Exhibit 10 into evidence.[23] The State also offered into evidence a DVD containing the statements Sanders made during her August 20, 2022 meeting with the State as State Exhibit 54. The trial court stated the exhibit had been admitted at the Article 38.49 hearing as State Exhibit 8.[24]

The State also offered into evidence a DVD containing audio recordings of four of Clifton's jail calls previously admitted at the Article 38.49 hearing (State Exhibit 57). State Exhibit 57 contains audio recordings of calls made on January 24 and 26, 2022, and August 19 and 21, 2022.[25] Clifton objected to the admission of the January 24, 2022 call included on State Exhibit 57, which includes statements

---

[23]    Clifton also objected to the admission of State Exhibit 10 pursuant to Texas Rules of Evidence 403, 404(b), and 802 (hearsay). The trial court overruled these objections and Clifton is not challenging the trial court's ruling on appeal.

[24]    Clifton did not object to the admission of State Exhibit 54 when it was admitted at trial.

[25]    The January 24 and 26, 2022 calls were included on State Exhibit 4. The August 19, 2022 call was included on State Exhibit 5, and the August 21, 2022 call was included on State Exhibit 6.

Sanders made to Clifton, based on hearsay and the Confrontation Clause.[26] The trial court noted that the jail calls had been admitted at the Article 38.49 hearing. The trial court overruled Clifton's objections and admitted State Exhibit 57 into evidence in its entirety.

The State also offered into evidence a report prepared by emergency medical personnel containing statements Sanders gave to a paramedic describing the assault (State Exhibit 55), and Sanders' hospital records, containing statements Sanders made describing the assault and identifying Clifton as her assailant (State Exhibit 56). Clifton objected to the admission of Sanders' statements in State Exhibits 55 and 56 based on the Confrontation Clause.[27] The State argued the statements were not testimonial and thus the Confrontation Clause was not applicable. The trial court overruled Clifton's objection and admitted State Exhibits 55 and 56 into evidence in their entirety.

## C.    Analysis

Clifton argues there is no evidence he engaged in conduct intended to prevent Sanders from testifying at trial. According to Clifton, the evidence shows he knew

---

[26]    Clifton also objected to the admission of State Exhibit 57 based on relevance, hearsay, and pursuant to Texas Rules of Evidence 403 and 404(b). The trial court overruled these objections and Clifton is not challenging the trial court's ruling on appeal.

[27]    Clifton also objected that the statements constituted inadmissible hearsay. The trial court overruled the objection and Clifton does not appear to be challenging the trial court's ruling on appeal.

he was facing twenty years' incarceration if convicted, and he believed the State would offer him either probation or time served if Sanders did not testify at trial, but there is no evidence he did "anything to dissuade [Sanders] from attending in the first place" or "attempt[ed] to procure [Sanders'] absence from the trial." Clifton argues that, at most, the evidence, including his August 21, 2022 phone call to his mother, demonstrates that his mother Viola offered Sanders $2,000 worth of baby clothes in a last-minute attempt to "entice [Sanders] into not coming to the trial." According to Clifton, "[n]othing on [the August 21, 2022] call indicates that [he] suggested that [Viola] take such an action."

Article 38.49 of the Texas Code of Criminal Procedure provides that a defendant "who wrongfully procures the unavailability of a witness . . . forfeits [his] right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing." TEX. CODE CRIM. PROC. art. 38.49. The record includes some evidence that Clifton wrongfully procured Sanders' unavailability for trial by acquiescing to his mother's actions in bribing Sanders to ensure she did not appear for his trial.

On January 19, 2022, eight months before Clifton's trial, Clifton and Viola discussed whether Sanders would be coming to his trial. Viola, who had spoken to Sanders, reported that Sanders told the State she was not coming. Viola told Clifton

57

that without Sanders' testimony, the State "ain't got nothing. They might as well release you." Five days later, Clifton told Viola to call Sanders because he wanted to "see what she talking about." When Sanders joined the call, Clifton told Sanders that, despite what the State may have told her, she did not have to come to court and testify against him. He told Sanders, "I just need you not to come and they will dismiss on my trial date." Sanders told Clifton that she told the State that she "wasn't a part of it," and they told her that "it is still up to the judge." Two days later, on January 26, 2022, Clifton told a person named Jordan that he and Sanders had nothing to talk about, and that he was "just trying to make sure the hoe [Sanders] gonna do what she's supposed to do so that I'm back on the other side."

In April 2022, Viola and Clifton continued to discuss the need to keep Sanders from testifying at trial because they believed that without her testimony, the State would have no choice but to dismiss the case. Clifton directed Viola to "make sure to let [Sanders] know don't try to do no [indistinguishable]." He also told Viola, "Hey try to call [Sanders] though. You know what I am saying." Viola responded, "I called. But you should be out."

On August 18, 2022, one week before Clifton's trial, Clifton called Viola using another inmate's SPN because he believed jail officials could not hear their conversation. Clifton told Viola, "You need to umm get somebody to call [Sanders] and make sure everything still . . . ." Viola interrupted Clifton and told him, "She

58

ain't coming. She already said she is not coming." Clifton said, "When? That was a long time but you don't know if they scared her or what." Viola told Clifton that Sanders was not coming to trial. Viola reported she had spoken to Clifton's lawyer and told him that Sanders was not coming to trial, that Clifton would not be going to trial, and that Clifton would accept either probation or time served. Viola told Clifton that his lawyer told her that Sanders told him she was not coming to trial, to which Clifton remarked that his lawyer told him that Sanders stated the State would be flying her to Houston, Texas the day before his trial was scheduled to start. Viola told Clifton that Sanders "ain't going to show up . . . they don't even know where that girl at."

After voir dire on August 19, 2022, Viola told Clifton, "That girl ain't coming to court, I am going to call her." Viola called Sanders and reported to Clifton that the State had subpoenaed Sanders for trial and Sanders didn't know if she was going to trial. Clifton asked Viola if she told Sanders that if "she doesn't come, they will dismiss the case and then they can't do nothing to her?" Viola responded, "Yeah." Viola called Sanders at Clifton's request and left a message. Clifton urged Viola, "Just call her back one more time. Try to call her back one more time. I don't think she had her on the phone because if they had her on the phone they would have gave me another charge for violating a protective order." Viola told Clifton that Sanders

59

had called her back twice and she indicated that Sanders was worried about disobeying the subpoena.

Clifton told Viola that Sanders was lying when she said she received a subpoena because his lawyer told him the State had not subpoenaed Sanders yet. Clifton told Viola that the State was calling Sanders, but "they do not know where she is." Viola responded that she tried to call Sanders, but Sanders "ain't answering no more." During the call, Clifton appears noticeably concerned that Sanders might testify at trial, despite her previous representation she would not be attending.

On Sunday, August 21, 2022, the day after Sanders met with the State via Zoom, Clifton called Viola again. Viola told Clifton she had spoken to Sanders for two hours and she assured Clifton that Sanders was not coming to his trial. When Clifton asked how she could be so sure Sanders would not testify, Viola said, "I know she ain't. I gave her baby $2,000 worth of clothes. [Sanders] said I am not coming. I am definitely not coming. She said I will not be there." Viola told Clifton she had "mailed [the clothes] to [Sanders]. It's going out, uh. We tried to send it off yesterday, but she said the address was a PO box . . . so uh, we mailing it off where it get there next day, so she will get it Tuesday," August 23, 2022—the day before Sanders was scheduled to fly to Houston for Clifton's trial.

Viola's statement indicates that Sanders accepted the clothes and assured Viola she would not testify at Clifton's trial. While Viola attempted to mail the

60

clothes to Sanders on Saturday, August 20, 2022, Viola was not successful and she told Clifton she planned to mail them on Monday, August 22, 2022 for "next day" delivery on Tuesday, August 23, 2022, one day before Sanders was scheduled to fly to Houston for Clifton's trial. Clifton did not object to Viola's plan to bribe Sanders to keep her from testifying at trial. Nor did he try to stop Viola from sending the clothes to Sanders. Viola followed up with Sanders on Tuesday, August 23, 2022, and Wednesday, August 24, 2022, to make sure she had received the clothes and was not coming to trial. On August 24, 2022, the day before trial, Viola assured Clifton that Sanders was not coming to trial. She told Clifton, "That girl told me yesterday she ain't coming. I am gonna to call her again and make sure she got her baby clothes because they was there."

During his calls to Viola, Clifton told her she needed to tell Sanders that if she did not testify, the State would dismiss the case against Clifton, and there was nothing the State could do to her if she did not comply with the State's subpoena. It is apparent from the calls that Clifton was concerned Sanders would come to Houston to testify at his trial, despite her prior statements to the contrary.

This evidence, when viewed in favor of the trial court's ruling admitting the objectionable evidence under the forfeiture by wrongdoing doctrine, demonstrates that Clifton knew about Viola's plan to bribe Sanders with baby clothes to ensure her absence trial, and he neither objected to the plan, nor make any attempt to stop

61

Viola from mailing the clothes to Sanders. Clifton tacitly agreed with Viola's decision to bribe Sanders. The trial court thus reasonably could have found from this evidence that Clifton acquiesced to Viola bribing Sanders with baby clothes to ensure her unavailability at Clifton's trial. *See* TEX. CODE CRIM. PROC. art. 38.49(b) (stating "[e]vidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are admissible" to prove forfeiture by wrongdoing); *see also Rivera*, 412 F.3d at 567 (stating "[a]ctive participation or engagement . . . is not required" for forfeiture by wrongdoing to apply and noting dictionary defines acquiescence as "the act or condition of acquiescing or giving tacit assent; agreement or consent by silence or without objection").

The trial court also could have reasonably concluded from the evidence that Clifton repeatedly directed Viola to contact Sanders to make sure she would not testify at his trial, that he instructed Viola to communicate certain information to Sanders for that purpose, and that any acts Viola took to keep Sanders from testifying at trial, including bribing Sanders, were done on Clifton's behalf. *See Olson*, 668 F.2d at 429 (stating someone acting on defendant's behalf to procure unavailability of witness can operate to waive defendant's hearsay objection).

We thus hold the trial court did not abuse its discretion by finding by a preponderance of the evidence that Clifton wrongfully procured Sanders'

62

unavailability at trial and was thus barred by the doctrine of forfeiture by wrongdoing from challenging the admission of Sanders' out-of-court statements to Deputy Fitts at the hospital (State Exhibit 10), to the State during the August 20, 2022 meeting (State Exhibit 8), and to Clifton during the January 24, 2022 phone call (State Exhibit 4) based on the Confrontation Clause. *See* TEX. CODE CRIM. PROC. art. 38.49(a)(2) (stating defendant "who wrongfully procures the unavailability of a witness or prospective witness . . . forfeits [his] right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing"); *id.* art. 38.49(b) ( "Evidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are admissible and may be used by the offering party to make a showing of forfeiture by wrongdoing . . . .").[28]  We similarly hold that the trial court did not abuse its discretion by admitting State Exhibits 4, 8, and 10 for the same reasons.

In his fourth issue, Clifton argues the trial court abused its discretion by admitting Sanders' statements included in the report prepared by emergency medical personnel (State Exhibit 55) and Sanders' hospital records (State Exhibit 56) because the admission of those statements violated his rights under the Sixth Amendment's

---

[28]     Clifton does not dispute that the bribe of $2,000 worth of baby clothes was intended to, and did in fact, procure Sanders' unavailability at trial.

63

Confrontation Clause. *See Paredes*, 462 S.W.3d 514 (stating Confrontation Clause precludes admission of witness' testimonial statements unless witness takes stand to be cross-examined or is unavailable and defendant had prior opportunity to cross-examine witness).[29]  Clifton suggests that he is not barred from challenging the admission of these statements based on the Confrontation Clause because the statements were not "the subject of the inquiry at the forfeiture-by-wrongdoing hearing."

The doctrine of forfeiture by wrongdoing is a rule of estoppel designed to prevent a defendant from benefiting from his own wrongdoing.  *See Colone*, 573 S.W.3d at 264 (stating doctrine of forfeiture by wrongdoing based on principle that tampering with witness "should . . . estop the tamperer from making any objection based on the results of his own chicanery"); *see also Gonzalez v. State*, 195 S.W.3d 114, 117 (Tex. Crim. App. 2006) (stating doctrine of forfeiture by wrongdoing "is based on common honesty and the maxim that no one shall be permitted to take advantage of his own wrong") (internal citations omitted).  Thus, a defendant who wrongfully procures a witness' unavailability cannot later challenge admission of that witness' out-of-court statements because the witness is not available for cross-

---

[29]  Testimonial statements are statements that were made under circumstances that would lead an objective witness to reasonably believe they would be available for use at a later trial.  *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015).

examination. *Colone*, 573 S.W.3d at 264–65.[30] We can discern no logical reason to allow a defendant to benefit from his own malfeasance simply because the out-of-court statements of the unavailable witness are admitted during trial as opposed to during the pre-trial Article 38.49 hearing. Moreover, Clifton has not directed this Court to, and we have not found, any authority that would support such a proposition.

Appellate courts must affirm an evidentiary ruling if the ruling is supported by the record and correct under any theory of law applicable to the case. *See Armendariz*, 123 S.W.3d at 405; *Osbourn*, 92 S.W.3d at 538. The trial court's decision to overrule Clifton's Confrontation Clause objections to State Exhibits 55 and 56 was correct because the out-of-court statements included in those exhibits were made by Sanders, the witness whose unavailability Clifton wrongfully procured, and thus, Clifton was barred from challenging the admission of those statements based on the Confrontation Clause. *See Armendariz*, 123 S.W.3d at 405; *Osbourn*, 92 S.W.3d at 538.

We overrule Clifton's third and fourth issues.

---

[30] A defendant can object to the admission of a witness' out-of-court statements on other grounds. *See Colone*, 573 S.W.3d at 266 ("Although the doctrine of forfeiture by wrongdoing bars Appellant from challenging statements about his prior commission of an aggravated robbery on the basis that those statements were made out of court, that doctrine does not prevent him from challenging the statements on the basis of their subject matter—that they describe an extraneous offense.").

## Post-Conviction Admonishments

In his fifth issue, Clifton argues the trial court failed to comply with Texas Administrative Code Section 176.1 because the court did not orally admonish Clifton that his possession of a firearm could lead to criminal charges. *See* TEX. ADMIN. CODE § 176.1. The State responds that "nothing in the Administrative Code specifies that that part of the admonishment be oral [and the] trial court gave [Clifton] a written admonishment that informed him of the possibility of criminal charges."

In his sixth issue, Clifton argues the trial court erred by admonishing him that, as a convicted felon, he could not possess ammunition because there is no Texas law prohibiting a convicted felon from possessing ammunition. While Texas law prohibits a convicted felon from possessing a firearm, the prohibition does not extend to ammunition. Federal law, however, prohibits convicted felons from possessing both firearms and ammunition. *See* 18 U.S.C. 922(g) ("It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[] to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.").

Even assuming, without deciding, that Section 176.1 of the Texas Administrative Code creates an enforceable right, and that the trial court erred by failing to admonish Clifton orally of his rights as a convicted felon under Section 176.1, and admonishing Clifton that he could not possess ammunition because there is no Texas law prohibiting a convicted felon from possessing ammunition, we cannot reverse on either basis unless Clifton was harmed by the error.  *See* TEX. R. APP. P. 44.2.  All errors are subject to harmless error analysis under Texas Rule of Appellate Procedure 44.2, except for a very narrow category of errors defined by the United States Supreme Court as "structural" errors.[31]  Although a defendant does not bear the burden to prove harm, he must still brief the question of harm and provide

---

[31] Structural errors comprise a narrow class of cases involving the deprivation of federal constitutional rights. *See Johnson v. State*, 169 S.W.3d 223, 235 (Tex. Crim. App. 2005) (citing *Johnson v. United States*, 520 U.S. 461, 468–469 (1997)); *see also Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (structural error is error of constitutional magnitude that "affect[s] the framework within which a trial proceeds rather than simply an error in the trial process itself").  The United States Supreme Court has defined the following errors as structural: (1) lack of an impartial trial judge; (2) the unlawful exclusion of members of the defendant's race from a grand jury; (3) the denial of the right to self-representation at trial; (4) the denial of the right to a public trial; (5) an instruction that erroneously lowers the burden of proof for conviction below the "beyond a reasonable doubt" standard; and (6) the total deprivation of counsel.  *See Johnson*, 520 U.S. at 468–69; *see also U.S. v. Davila*, 569 U.S. 597, 611 (2013) (stating structural errors constitute "highly exceptional category" of errors).  The Texas Court of Criminal Appeals plurality decision in *Lake v. State*, 532 S.W.3d 408 (Tex. Crim. App. 2017), indicates that a very narrow class of non-structural errors may also be immune to a harmless error analysis.  *Id.* at 411 (citing *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997) ("Except for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error . . . is categorically immune to a harmless error analysis.")).

supporting arguments, substantive analysis, and appropriate citations to authorities and to the record to avoid briefing waiver. *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) ("Neither the State nor the defendant has a burden to prove harm."); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding defendant waived issue on appeal because he failed to address whether alleged error was harmful); *see also* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

Clifton neither argues he was harmed by the trial court's failure to admonish him orally that, as a convicted felon, his possession of a firearm could result in criminal charges or by the trial court admonishing him that he could not possess ammunition, nor does he assert that these alleged errors fit one of the very narrow exceptions that are immune from the harmless error analysis. Clifton thus waived these issues due to inadequate briefing. *See Cardenas*, 30 S.W.3d at 393; *see also Wilson v. State*, 473 S.W.3d 889, 901 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (holding defendant waived issue when he did not "argue that he was harmed by" alleged error).

We overrule Clifton's fifth and sixth issues.

## Assessment of Court Costs

In his seventh issue, Clifton argues the trial court erred by assessing him a $185 state consolidated court cost and a $105 local consolidated court cost because he committed the offense on June 3, 2019, and these consolidated courts costs are to be assessed only for offenses committed on or after January 1, 2020. *See* TEX. LOC. GOV'T CODE § 134.101. Clifton asks the Court to remand the case to the trial court for a correct assessment of court costs.

The State agrees that the assessment of court costs is incorrect and asks the Court to remand the case to the trial court for a correct assessment of court costs, but only after affirming the conviction and sentence.[32] *See Authorlee v. State*, No. 14-20-00821-CR, 2022 WL 220267, at *4 (Tex. App.—Houston [14th Dist.] Jan. 25, 2022, pet. ref'd) (mem. op., not designated for publication) (affirming conviction and sentence but remanding for proper assessment of court costs). Having overruled Clifton's challenges to his conviction and sentence, we agree with the State.

We therefore sustain Clifton's seventh issue.

---

[32] The State argues that the trial court's alleged failure to inquire on the record about Clifton's ability to pay fines and costs is harmless. *See* TEX. R. APP. P. 44.2.

69

## Conclusion

We affirm Clifton's conviction and sentence and remand the case to the trial court for a correct assessment of court costs.[33]  *See id.*

Veronica Rivas-Molloy
Justice

Panel consists of Justices Goodman, Landau, and Rivas-Molloy.

Do Not Publish.  TEX. R. APP. P. 47.2(b).

---

[33]    In his eighth issue, Clifton argues the trial court violated Article 42.15(a-1) of the Texas Code of Criminal Procedure by imposing $290 in consolidated court costs against him without first inquiring on the record about his ability to pay such costs and he asks this court to remand the case to the trial court to conduct an on-the-record inquiry.  In his ninth issue, Clifton argues that the judgment incorrectly omits the "Statute for Offense," the bar-card numbers of Clifton's defense counsel and the two prosecutors, and an affirmative finding that Clifton committed a felony.  He further contends that the trial court failed to "check the box next to the statement that the sentence is to be executed" and although the judgment gives him credit for 550 days of jail time to be used "toward incarceration, fine, and costs," the judgment does not explain how such credits are to be allocated.

Because we are remanding the case to the trial court to reassess the amount of court costs, the trial court will have an opportunity to inquire on the record into Clifton's ability to pay costs and make any modifications to the judgment it deems necessary.  Therefore, we need not address issues eight and nine on appeal.

We note that the trial court may also take this opportunity to provide any further admonishments to Clifton that the trial court deems appropriate.